**TOLEDO FAIR HOUSING CENTER et al.**

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY et al.**

Court of Common Pleas of Ohio,
Lucas County.

No. 93–1685.

Decided Jan. 17, 1996.

20

*Cooper, Walinski & Cramer, Stephen Dane, Janet Hales* and *Margaret Lock-hart; Washington Lawyers Committee for Civil Rights Under Law* and *John P. Relman; Richard J. Ritter; William Howard Lynch; Hall, Patterson & Charne, S.C.,* and *Gretchen Elizabeth Miller,* for plaintiffs.

*Fox & Grove, Jeffrey Goldman, Allison Blakely, Joel Rice* and *Diane Cifuentes Gerew; Fuller & Henry* and *Martin J. Witherell,* for defendants.

FREDERICK H. MCDONALD, Judge.

This case is before the court upon the plaintiffs' motion for class certification and upon plaintiffs' two motions to compel discovery. Upon consideration of the pleadings, the evidence, the written arguments of counsel, and the applicable law,

I find that the motion for class certification should be granted, and the motions to compel should be granted, in part and denied in part

I

This case involves homeowner's insurance and allegations of "redlining." The plaintiffs are the Toledo Fair Housing Center ("the Center") and twelve individual plaintiffs who allege, generally, that defendants Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company (collectively "Nationwide") unlawfully discriminate against present and prospective homeowners in African–American neighborhoods by making unfavorable insurance determinations based solely on the property's location in an African–American neighborhood.[1] Specifically, the plaintiffs allege that Nationwide (1) uses sales practices and techniques that discourage homeowners and prospective homeowners in African–American neighborhoods from purchasing insurance (e.g., by not returning phone calls, by not providing price quotes, etc.); (2) makes insurance unavailable to homeowners and prospective homeowners in African–American neighborhoods under the same terms and conditions as homeowners in white neighborhoods; (3) refuses to issue policies in African–American neighborhoods; (4) sometimes refuses to insure properties for less than a certain minimum amount, a policy applied differently in African–American neighborhoods than in white neighborhoods; and (5) cancels or refuses to renew policies already in place in African–American neighborhoods on grounds not similarly applied in white neighborhoods. Because of this alleged discrimination, the plaintiffs seek declaratory and injunctive relief, compensatory damages, punitive damages, court costs, and attorney fees.

The plaintiffs seek to certify the following class:

"All persons who, at any time between July 1, 1979 and the date of trial, have owned a home located in an African–American neighborhood in the City of Toledo. An 'African–American neighborhood' is defined for purposes of this case as any census tract with an African–American population greater than fifty percent (50%), according to 1990 U.S. Census Data."

The plaintiffs are, except for the Center, all African–American individuals. All of the named individual plaintiffs, except for Paulette Hardnett and Marie Boyd, are current homeowners and residents of an African–American neighborhood in the city of Toledo; Paulette Hardnett and Marie Boyd are alleged to be "prospective homeowners" in an African–American neighborhood.

---

1. The plaintiffs define "African–American neighborhood" as "any census tract with an African–American population greater than fifty percent (50%), according to 1990 U.S. Census Data."

In addition to the motion for class certification, the plaintiffs have also filed two motions to compel discovery of voluminous records of Nationwide. Many of the records sought are stored electronically.

By way of defense on the merits, Nationwide has denied that it has engaged or is engaging in redlining. In addition, it has raised other defenses to plaintiffs' claims. It opposes plaintiffs' motion for class certification. It also opposes their motions to compel.

## II

Civ.R. 23(C)(1) provides:

"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

A trial court is afforded broad discretion in determining whether to certify a case as a class action. See *Marks v. C.P. Chem. Co., Inc.* (1987), 31 Ohio St.3d 200, 201, 31 OBR 398, 398–399, 509 N.E.2d 1249, 1251–1252 (certification denied); *Logsdon v. Natl. City Bank* (1991), 62 Ohio Misc.2d 449, 455, 601 N.E.2d 262, 266. In determining whether to certify a class, a trial court may not consider the merits of the case, except for the limited purpose of determining whether the Civ.R. 23 requirements are met. See *Lintemuth v. Saturn Corp.* (Aug. 29, 1994), M.D.Tenn. No. 1:93–0211, unreported at *4, 1994 WL 760811; see, also, *Gen. Tel. Co. of the Southwest v. Falcon* (1982), 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740, 752.[2] According to the Supreme Court of Ohio, a trial judge must make seven affirmative findings before certifying a case as a class action; two such findings are implicitly required by Civ.R. 23, while five are specifically required by that rule. *Warner v. Waste Mgt., Inc.* (1988), 36 Ohio St.3d 91, 521 N.E.2d 1091, paragraph one of the syllabus. It must appear to the court by a preponderance of the evidence that all of the seven requirements are met. *Id.* at 94, 521 N.E.2d at 1094–1095. The burden of establishing that class action treatment is appropriate is on the plaintiffs. *State ex. rel Ogan v. Teater* (1978), 54 Ohio St.2d 235, 247, 8 O.O.3d 217, 223–224, 375 N.E.2d 1233, 1241.

As a general rule, a trial court may hold an evidentiary hearing in connection with the class certification motion if facts related to class issues are disputed. See 2 Newberg, Newberg on Class Actions (1992) 7–35 to 7–38, Section 7.09.

---

2. Since Civ.R. 23 is identical to Fed.R.Civ.P.23 in all material respects, federal authority is an appropriate interpretive aid for Civ.R. 23. *Marks*, 31 Ohio St.3d at 201, 31 OBR at 398–399, 509 N.E.2d at 1251–1252.

Often, it will be unnecessary to hold such a hearing. *Id.* In *Warner,* the Supreme Court of Ohio stated:

"We recognize a trial court is not required to hold an evidentiary hearing for all such cases. *Franks v. Kroger Co.* (C.A.6, 1981), 649 F.2d 1216, 1223–1224. It is rare, however, that the pleadings in a class certification action will be so clear that a trial judge may find, by a preponderance of the evidence, that certification is or is not proper." *Warner,* 36 Ohio St.3d at 98, 521 N.E.2d at 1098, fn. 9.

In this case, the parties did not move for an evidentiary hearing. According to the plaintiffs, thirty depositions have already been taken and, according to Nationwide, by 1994 it had already produced thousands of documents and it was in the process of producing thousands more. Because the evidentiary record is more than ample, and because I find that the facts necessary to make the class determination are largely undisputed, an evidentiary hearing is not required in this case.

The five specific requirements are found in Civ.R. 23(A) and (B), which state:

"(A) Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"(B) Class actions maintainable. An action may be maintained as a class action if the prerequisites of subdivision (A) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

"(b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."

Finally, before certifying a class, a trial court must find that two implicit requirements of Civ.R. 23 are met: that an identifiable class exists and that the class representatives are members of the class. *Warner,* 36 Ohio St.3d at 96, 521 N.E.2d at 1095–1096.

No one factor under either Civ.R. 23(A) or (B) should be overemphasized to defeat the basic purpose behind Civ.R. 23. *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 235, 12 OBR 313, 317–318, 466 N.E.2d 875, 879.

Each of the seven requirements for class certification will be discussed individually.

1. Numerosity

The first express requirement for class certification is that the "class is so numerous that joinder of all members is impracticable." Civ.R. 23(A)(1). The numerosity requirement must be decided on a case-by-case basis but, generally, if a class has more than forty members, numerosity is satisfied. *Warner,* 36 Ohio St.3d at 97, 521 N.E.2d at 1096–1097. In this case, the evidentiary materials indicate that the proposed class would consist of 8,766 members. The parties appear to agree that this number satisfies the numerosity requirement.

2. Commonality

In the most general terms, the commonality requirement of Civ.R. 23(A)(2) is met by a common nucleus of operative facts, or by showing that questions of law or fact are common to the class. *Marks,* 31 Ohio St.3d at 202, 31 OBR at 399–400, 509 N.E.2d at 1252–1253. For example, commonality exists where the basis for liability is common to the putative class members, *Ojalvo,* 12 Ohio St.3d at 235, 12 OBR at 317–318, 466 N.E.2d at 879, or where a common fact question exists relating to negligence, breach of contract, practice of discrimination, etc., *Warner,* 36 Ohio St.3d at 97, 521 N.E.2d at 1096–1097; *Lowe v. Sun Refining & Marketing Co.* (1992), 73 Ohio App.3d 563, 570, 597 N.E.2d 1189, 1193–1194. Even though some legal and factual issues may differ, these differences do not enter into the analysis until the trial court considers the Civ.R. 23(B)(3) requirements of predominance and superiority. *Marks,* 31 Ohio St.3d at

202, 31 OBR at 399–400, 509 N.E.2d at 1252–1253. According to Ohio courts, the commonality requirement is given a "permissive application," and it is easily met. See, *e.g., Warner,* 36 Ohio St.3d at 97, 521 N.E.2d at 1096–1097.

■ In this case, common legal and factual questions exist: whether Nationwide discriminates in its issuance or renewal of insurance to homeowners in African–American neighborhoods and whether Nationwide's practices violate R.C. 4112.02(H).[3] Even though some factual issues may differ (due to the various circumstances surrounding each case), these factual issues do not prevent a finding of commonality: such differences do not enter into the analysis until the Civ.R. 23(B)(3) requirements of predominance and superiority are considered. *Marks,* 31 Ohio St.3d at 202, 31 OBR at 399–400, 509 N.E.2d at 1252–1253; *Lowe,* 73 Ohio App.3d at 570, 597 N.E.2d at 1193–1194. Since the commonality requirement is to be given a permissive application, *id.,* and since, at the very least, the basis of liability is common to all class members, the commonality requirement is met.

3. Typicality

■ The purpose of the typicality requirement of Civ.R. 23(A)(3) is to protect the interests of absent class members. *Marks,* 31 Ohio St.3d at 202, 31 OBR at 399–400, 509 N.E.2d at 1252–1253. Further, according to one commentator,

"The rationale for [the typicality] provision is that a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with those of the representative." 1 Newberg, Newberg on Class Actions (1992) 3–74 to 3–75, Section 3.13.

Ohio courts have held that the typicality requirement is satisfied where no express conflict exists between representatives and class members. *Warner,* 36 Ohio St.3d at 98, 521 N.E.2d at 1097–1098; *Marks,* 31 Ohio St.3d at 202, 31 OBR at 399–400, 509 N.E.2d at 1252–1253. The typicality requirement overlaps to some extent with the commonality requirement. One court stated:

"The difference is one of focus. Rule 23(a)(2) assures that there is a shared interest among the class in resolving a certain issue. Rule 23(a)(3) examines

---

3. R.C. 4112.02(H)(4) provides that it is unlawful to:

"(4) Discriminate against any person in the terms or conditions of selling, transferring, assigning, renting, leasing, or subleasing any housing accommodations or in furnishing facilities, services, or privileges in connection with the ownership, occupancy, or use of any housing accommodations, including the sale of fire, extended coverage, or homeowners insurance, because of race, color, religion, sex, familial status, ancestry, handicap, or national origin or because of the racial composition of the neighborhood in which the housing accommodations are located."

whether the named representative's particular claim presents that issue on behalf of the plaintiff class. The relative simplicity of the typicality requirement may be summed up as follows; a plaintiff's claim is typical if it arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory. 1 H. Newberg, Class Actions § 1115b (1977)[.]" (Other citations omitted.) *Zeffiro v. First Pa. Banking & Trust Co.* (E.D.Pa.1983), 96 F.R.D. 567, 569.

Nationwide contends that typicality does not exist because (1) the class representatives are all African–American and some of the class members are not African–American; (2) some of plaintiffs are or have been Nationwide insureds, while many of the class members have allegedly been denied insurance; and (3) the plaintiffs' claims turn on highly unique facts.

■ The first issue that emerges with regard to the typicality requirement is whether minority plaintiffs may represent non-minority class members. In support of its contention that minority plaintiffs' claims are inherently atypical of non-minorities' claims, the defendant cites an employment discrimination case, *Frazier v. Consol. Rail Corp.* (D.D.C.1986), 41 F.E.P. 665, 1986 WL 11237, and a fair housing case, *Strykers Bay Neighborhood Council v. City of New York* (S.D.N.Y.1988), 695 F.Supp. 1531. Both cases are "pure" race discrimination cases; in other words, the plaintiffs in both cases allege discrimination solely on the basis of race.[4] In support of their contention that the minority plaintiffs' claims are typical of non-minority class members' claims, the plaintiffs cite three federal fair housing cases, *Trafficante v. Metro. Life Ins. Co.* (1972), 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415, *Gladstone, Realtors v. Bellwood* (1979), 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66, and *Havens Realty Corp. v. Coleman* (1982), 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214. All of these cases stand firmly for the proposition that any member of a neighborhood, regardless of race, has standing to sue under the federal fair housing law.

The cases cited by the parties are inapposite. The cases cited by Nationwide are inapplicable because the instant case is not a "pure" race discrimination case: In this case, the plaintiffs do not allege that Nationwide discriminated against them because of their race; they allege that Nationwide discriminated against them because of the neighborhood in which they lived (predominantly African–American). Because this is a "neighborhood" discrimination case and not a race discrimination case, anyone who lives in the neighborhood, regardless of race, has claims typical of all of the other class members.

---

4. In *Strykers Bay,* the court stated, "The subclass as defined includes both minority and non-minority former residents of site 30. One of the plaintiffs' claims is that defendants have discriminated against the subclass on the basis of race." *Strykers Bay,* 695 F.Supp. at 1537.

The cases cited by the plaintiffs are not entirely on point, either, as they all deal with standing issues. In determining whether plaintiffs have standing, the question is whether the plaintiffs have suffered an injury against which the statute in question was designed to protect. *Open Hous. Ctr. v. Samson Mgt. Corp.* (S.D.N.Y.1993), 152 F.R.D. 472, 476, fn. 8. This inquiry is different from the typicality inquiry, *i.e.*, whether the class representatives have claims typical of the class members. *Id.* Nevertheless, the standing cases are instructive in their portrayal of housing discrimination cases: Everyone in a given neighborhood is aggrieved by housing discrimination because, when the effect of discrimination is to eliminate minorities from a neighborhood, everyone equally suffers "the loss of important benefits from interracial associations." *Trafficante,* 409 U.S. at 210, 93 S.Ct. at 367, 34 L.Ed.2d at 419. Since everyone in a neighborhood, regardless of race, is aggrieved by housing discrimination practices, it stands to reason that everyone in the neighborhood has claims typical of the others.

█ The second typicality issue raised by Nationwide is whether class representatives who are, or have been, Nationwide insureds have claims typical of class members who have been denied Nationwide coverage. Nationwide presents only a brief argument on this point. According to Nationwide:

"Typicality is also defeated because fully half of the proposed class representatives * * * have, at some point in time, been afforded precisely that which the remaining plaintiffs claim to have been wrongfully denied—Elite II (replacement cost) insurance from Nationwide. That typicality is defeated by this simple fact is demonstrated by those employment cases in which current (or former) employees seek to represent actual or potential applicants for employment."

Nationwide then discusses two employment cases in which class certification was denied because a named plaintiff had the job that other class members claimed to be excluded from.

In this case, the plaintiffs claim more than that some of the class members were denied coverage. They also claim that (1) Nationwide uses sales techniques that tend to discourage present and prospective homeowners in African–American neighborhoods from purchasing insurance; (2) Nationwide makes insurance unavailable to present and prospective homeowners in African–American neighborhoods under the same terms and conditions as in white neighborhoods (*e.g.*, by charging higher rates or less attractive policies for those seeking insurance on homes in African–American neighborhoods); (3) Nationwide sometimes refuses to insure properties in African–American neighborhoods for less than a certain minimum amount, a policy not always applied in white neighborhoods; and (4) Nationwide cancels or refuses to renew policies because of the racial composition in African–American neighborhoods. In other words, the plaintiffs appear to be alleging "across-the-board" discrimination. See *Falcon,* 457 U.S. at 157–158, 102

S.Ct. at 2370–2371, 72 L.Ed.2d at 750–751. Because the plaintiffs allege across-the-board discrimination, Nationwide's description of a "typical" claim is too narrow.

In defining across-the-board discrimination, one judge drew this distinction:

"Some courts allow the representative to launch an 'across-the-board' attack on discriminatory practices, while others subscribe to a more restrictive 'same-impact' doctrine, and in given cases, the outcome could be vastly affected. To illustrate, upon an across-the-board challenge a named plaintiff who suffered from only one form of employment discrimination, such as denial of promotion, could represent a class comprising all employees hurt by any of the employer's discriminatory practices. The same-impact approach, however, limits the class to persons who have sustained injuries identical to those of the class representative; for example, a plaintiff discriminatorily refused transfer could represent only others denied transfer." (Footnotes omitted.) *Council of the Blind of Delaware Cty. Valley v. Regan* (D.D.C.1983), 709 F.2d 1521, 1547 (Robinson, J., concurring in part and dissenting in part).

The Ohio Supreme Court has apparently not expressed a preference for either the across-the-board or the same-impact approach, but the United States Supreme Court has expressed its cautious approval of the across-the-board approach. See *Falcon*, 457 U.S. at 157–158, 102 S.Ct. at 2370–2371, 72 L.Ed.2d at 750–751. While agreeing with the general principle underlying across-the-board discrimination cases (that racial discrimination is by definition class discrimination), the court stated that a wide gap exists between "(a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." (Footnote omitted.) *Falcon*, 457 U.S. at 157, 102 S.Ct. at 2370, 72 L.Ed.2d at 750.

According to the court, proof of the individual's claim of discrimination in promotion does not justify the additional inferences that discrimination in promotion is a company practice, that the company's promotion practices were motivated by a discriminatory animus, or that the policy of discrimination (if it exists) is manifested in other employment practices such as hiring. *Falcon*, 457 U.S. at 158, 102 S.Ct. at 2371, 72 L.Ed.2d at 750–751. Because the plaintiff in *Falcon* failed to specifically identify the questions of law or fact common to him and the class members, the court held that the trial court erred in presuming typicality. *Id.*

In footnote 15 of *Falcon*, the Supreme Court set out the kind of presentation that a plaintiff in an across-the-board case would need to make to justify a finding of commonality and typicality. According to the court:

"If [the company] used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision making processes." *Falcon*, 457 U.S. at 159, 102 S.Ct. at 2371, 72 L.Ed.2d at 751, fn.15.

Though *Falcon* is an employment discrimination case, the reasoning and the policy inherent in *Falcon* are equally applicable in the housing discrimination context. Like pure race discrimination cases, neighborhood discrimination based on racial composition is necessarily class discrimination. Therefore, if the plaintiffs in this case make the sort of showing called for in *Falcon*'s footnote 15, an across-the-board attack on all of Nationwide's practices will be permitted.

Without weighing the evidence or judging its credibility, I find that some evidence exists in the present record to support a finding by the trier of fact in this case that Nationwide may use a "biased testing procedure," see *Falcon*, 457 U.S. at 147, 102 S.Ct. at 2365, 72 L.Ed.2d at 744–745, or, in the insurance context, a set of underwriting rules that discriminates against African–American neighborhoods. See Plaintiffs' Memorandum and Exhibits in Support of Motion for Partial Summary Judgment, Exhibit 3. According to that evidence, Nationwide's minimum insurance amount and its maximum dwelling-age requirements may have a disparate impact on African–American neighborhoods. This evidence, if accepted, is also sufficient to support a finding that Nationwide operates under a general policy of discrimination. *Id.* According to *Falcon*, such company-wide policies are sufficient to support a finding of typicality in an across-the-board discrimination case.[5]

---

**5.** It must be emphasized that these are not findings on the merits, as a court is not permitted to consider the merits in deciding a class certification motion. See, *e.g., Ojalvo*, 12 Ohio St.3d at 233, 12 OBR at 315–316, 466 N.E.2d at 877–878. This evidence is considered solely for the purpose of determining whether the plaintiffs have sufficiently met their burden to show that the class representatives' claims are typical of the class members' claims, given that some of the class members have Nationwide insurance and others allegedly have never been able to get it. See *Linternuth v. Saturn Corp.* (Aug. 29, 1994), M.D. Tenn. No. 1:93–0211, unreported at *4, 1994 WL 760811; *Capaci v. Katz & Besthoff, Inc.* (E.D.La.1976), 72 F.R.D. 71, 75.

The third issue raised by Nationwide under the typicality requirement is whether the factual differences in this case render the plaintiffs' claims atypical of the class members' claims. Nationwide contends that typicality is not met because the class members' claims turn on highly individualized facts as to the age and condition of each of the homes, the circumstances surrounding nonrenewal of the contracts that were nonrenewed, the circumstances surrounding cancellation of the contracts that were cancelled, the circumstances surrounding Nationwide's refusal to extend insurance to those who were unsuccessful in obtaining insurance, etc.

According to the Ohio Supreme Court, "typical" does not mean "identical." *Planned Parenthood v. Project Jericho* (1990), 52 Ohio St.3d 56, 64, 556 N.E.2d 157, 165–166, rehearing denied (1990), 53 Ohio St.3d 706, 558 N.E.2d 61. In class action cases, almost without exception, some individual questions will exist. Nevertheless, this case is more than just a string of individual lawsuits; it is a case alleging broad, company-wide practices and policies. Therefore, the individual facts and circumstances of each plaintiff's case are not the dominant aspect of this lawsuit. The more important questions are the class questions. Because the plaintiffs are residents of an African–American neighborhood, their "class-type" claims are typical of the class members' claims.

Based upon all of the foregoing, I find that the typicality requirement is met.

4. Adequacy of Representation

The adequacy-of-representation requirement has two components: Civ.R. 23(A)(4) requires both that the class representatives fairly and adequately protect the class members' interests and that the counsel for the class is experienced in handling class litigation. Courts and commentators agree that the adequacy-of-representation requirement merges to some extent with the Civ.R. 23(A) requirements of commonality and typicality. According to the United States Supreme Court:

"The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interests." *Falcon,* 457 U.S. at 157, 102 S.Ct. at 2371, 72 L.Ed.2d at 750, fn. 13. See, also, 1 Newberg, Newberg on Class Actions (1992) 3–127 to 3–128, Section 3.22.

■ With regard to the adequacy of the class representatives, the Ohio Supreme Court has held that this prong of the adequacy-of-representation requirement is satisfied as long as the representatives' interests are not antagonistic to the class members' interests. *Marks*, 31 Ohio St.3d at 203, 31 OBR at 400–401, 509 N.E.2d at 1253–1254; *Warner*, 36 Ohio St.3d at 98, 521 N.E.2d at 1097–1098. In arguing that the plaintiffs are inadequate class representatives, Nationwide reiterates its argument that class representatives who own a Nationwide homeowner's policy (particularly those with a replacement-cost policy) have interests antagonistic to putative class members who do not have Nationwide insurance. According to Nationwide, if it were required to relax its underwriting restrictions to provide replacement cost coverage to the putative class members, the class representatives who are current Nationwide insureds would experience an increase in premiums. Nationwide also argues that Nationwide has defenses unique to three of the plaintiffs (the statute of limitations defense), and that the two plaintiffs whose Nationwide policies were cancelled or nonrenewed for nonpayment are not adequate class representatives. The plaintiffs, on the other hand, argue that class members' insured status does not make their interests antagonistic to noninsured class members. According to the plaintiffs, no Nationwide insured will be harmed if Nationwide increases its business in African–American neighborhoods.

■ Many of the adequacy-of-representation issues have been resolved in connection with the ruling on the typicality requirement. Additionally, however, it must appear from the evidence that the plaintiffs' interests are not antagonistic to the class members' interests, *Marks*, 31 Ohio St.3d at 203, 31 OBR at 400–401, 509 N.E.2d at 1253–1254, or, stated another way, that the plaintiffs' representation of the class members does not create a conflict of interest, *Falcon*, 457 U.S. at 157, 102 S.Ct. at 2371, 72 L.Ed.2d at 750, fn. 13. In this case, I find no inherent conflict in the insured status of some of the plaintiffs. Though Nationwide argues that current Nationwide insureds would experience an increase in premiums if Nationwide were compelled to relax its underwriting restrictions, this conflict is at best hypothetical. Denial of class certification cannot be based on a hypothetical or speculative conflict of interest. See *Chisholm v. United States Postal Serv.* (C.A.4, 1981), 665 F.2d 482, 493, fn. 12.[6]

■ Nationwide also argues that it has unique defenses to the claims of three plaintiffs, thus rendering these plaintiffs inadequate representatives. While this argument is more appropriately discussed in the typicality context, to the extent

---

6. In support of its contention that the insured plaintiffs' interests conflict with the interests of the uninsured class members, Nationwide points to the affidavits of Spencer L. Kimball and Richard E. Stewart. However, both of these affidavits were given for cases other than this one, and neither addresses the specific facts of this case.

that the typicality and adequacy-of-representation requirements overlap, it is justifiably discussed here as well. The typicality requirement focuses on whether the plaintiffs have claims and defenses "typical" to the claims and defenses of the class members. The focus is on the *plaintiff's* claims and defenses, not on the defendants's defenses against the plaintiff. See *Seidman v. Am. Mobile Sys., Inc.* (E.D.Pa.1994), 157 F.R.D. 354, 361. Therefore, it would be improper to deny class certification based on the varying defenses that a defendant may have against a plaintiff. As long as the plaintiff's claims and defenses are typical, the typicality requirement (and the adequacy-of-representation requirement, to the extent that they overlap) is satisfied.

Another issue involved in the adequacy-of-representation requirement is whether the class representatives will vigorously prosecute the case. Typical concerns of this sort might be whether the plaintiff has the financial wherewithal to litigate the case to completion, see, *e.g., Ralston v. Chrysler Credit Corp.* (Apr. 28, 1992), Lucas C.P. No. 90–3433, unreported, or whether the plaintiff is staying abreast of the litigation (*e.g.,* by meeting deadlines, etc.). Apparently in this regard, Nationwide argues that the plaintiffs whose insurance was cancelled or nonrenewed for failure to pay are inadequate class representatives. However, the litigation of this case has not apparently suffered for lack of funds, and I find that the absent class members are being adequately represented by the existing class representatives.

Finally, the second prong of the adequacy-of-representation requirement requires that the class representatives have adequate legal representation, again to protect the interests of absent class members. See, *e.g., Warner,* 36 Ohio St.3d at 98, 521 N.E.2d at 1097–1098. The parties do not dispute that Cooper, Walinski and Cramer is an adequate legal representative of the class, and, based on the affidavit of Stephen M. Dane, I find the same.

5. Identifiable Class

According to the court in *Warner,* 36 Ohio St.3d at 96, 521 N.E.2d at 1095–1096, an identifiable class is one that is unambiguous. Amorphous classes such as "all people active in the peace movement" are not readily identifiable. *Id.* In this case, the parties do not appear to dispute that an identifiable class exists, and I find that the class as defined is readily identifiable.

6. Class Membership

The Ohio Supreme Court holds strictly to the second implicit requirement of Civ.R. 23 that class representatives be members of the class. *Warner,* 36 Ohio St.3d at 96–97, 521 N.E.2d at 1095–1097. In this case, the Center, Paula Hardnett, and Marie Boyd are found not to be class members because they were not homeowners in an African–American neighborhood between 1979 and the

present.[7] It follows that these three plaintiffs cannot be class representatives. Since the remaining plaintiffs qualify as class members, they can properly act as class representatives.

7. The Civ.R. 23(B) Requirements

■ Finally, before the class can be certified, the plaintiffs must satisfy one of the requirements of Civ.R. 23(B). The plaintiffs seek certification under Civ.R. 23(B)(2) and (3). According to the court in *Warner*, (B)(2)[8] would be the appropriate vehicle for a typical discrimination suit under Title VII (Section 2000e, Title 42, U.S.Code). *Warner*, 36 Ohio St.3d at 95, 521 N.E.2d at 1095. However, (B)(2) is inappropriate where the primary relief sought is damages. *Marks*, 31 Ohio St.3d at 203, 31 OBR at 400–401, 509 N.E.2d at 1253–1254. In this case, the plaintiffs seek injunctive and declaratory relief, and they also seek compensatory damages. A review of the record in this case requires the conclusion that neither form of relief is primary. It appears that both remedies are equally important. Since Nationwide has allegedly acted or refused to act on grounds generally applicable to the class, and since injunctive or declaratory relief would be appropriate for the class as a whole, this case is properly certifiable under Civ.R. 23(B)(2).

■ The plaintiffs also seek certification under Civ.R. 23(B)(3).[9] The (B)(3) action is known as the "damage" action. See *Warner*, 36 Ohio St.3d at 95–96, 521 N.E.2d at 1095–1096. In order to satisfy the (B)(3) requirement, a court must find (1) that common questions predominate over individual questions, and (2) that a class action is superior to other methods of adjudication. *Id.* at 96, 521 N.E.2d at 1095–1096. For (B)(3) purposes, it is not enough that common

---

**7.** It is unclear from the record whether Boyd owned a home in an African–American neighborhood between 1979 and the present. Since the record is not clear on this point, Boyd will not, for the time being, be certified as a class representative. However, since this class certification determination is conditional, Boyd's dismissal as a class representative can be revisited upon a proper motion. Civ.R. 23(C)(1).

**8.** Certification under Civ.R. 23(B)(2) is appropriate when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole * * *[.]"

**9.** Certification under Civ.R. 23(B)(3) is appropriate where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."

questions exist; the common questions must be a significant part of the case and it must be possible for them to be resolved for all members in a single adjudication. *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 313, 15 OBR 439, 441–442, 473 N.E.2d 822, 824–825. Regarding the "superior method" requirement of (B)(3), the court must make a comparative evaluation of all of the available adjudicative methods in order to determine whether a class action is effective enough to justify the judicial time and energy involved in managing such a lawsuit. *Id.* In making this determination, a court should be guided by the four factors listed in (B)(3), which together embody the policy objectives of the rule. *Id.* at 314, 15 OBR at 442–443, 473 N.E.2d at 825–826.

In this case, individual questions certainly exist. However, certain common questions are overarching, and they form the crux of this case. The biggest issue in this case is not how an individual plaintiff was treated, but whether Nationwide's policies adversely affect homeowners in African–American neighborhoods. The disparate-impact issue is common to all class members, and it is possible to resolve this issue for all class members in a single adjudication. Thus, common questions predominate.

Regarding the superior-method requirement, I find that because common questions predominate and because the cost of individual lawsuits to both plaintiffs and Nationwide would far exceed the cost of a class action, the class action is the superior method. Certification of the class in this case promotes judicial economy and eliminates needless expense for the parties.

For all of the foregoing reasons, I find that the plaintiffs have met their burden of establishing by a preponderance of the evidence that class certification is proper. Therefore, the motion for class certification is found to be well taken and will be granted.

## III

With regard to the motions to compel discovery, the general rules governing discovery are set forth in Civ.R. 26. Civ.R. 26(B)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." The scope of discovery is broad and encompasses any request that "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* When a party seeks discovery that is not forthcoming from the opposing party, a court may grant a motion to compel that discovery. Civ.R. 37(A)(2) provides:

"If * * * a party fails to answer an interrogatory submitted under Rule 33, or if a party, in response to a request for inspection [of documents] submitted under

Rule 34, fails to * * * permit inspection as requested, the discovering party may move for an order * * * compelling inspection in accordance with the request."

The provisions of the Civil Rules are to be liberally construed, particularly in complex civil rights litigation. *Laufman v. Oakley Bldg. & Loan Co.* (S.D.Ohio 1976), 72 F.R.D. 116, 120.

### A. The First Motion to Compel

The plaintiffs filed their first motion to compel on September 19, 1994. A hearing on the motion was held on January 5, 1995, and the parties subsequently filed briefs on the issue of burdensomeness.

On November 9, 1994, the plaintiffs also filed a motion to supplement the record for purposes of ruling on their first motion to compel. Nationwide objects to this motion, claiming that the material that the plaintiffs seek to add is fragmentary and misleading. Because the record is sufficient to permit a ruling on the first motion to compel without the introduction of new evidence, the plaintiffs' motion to supplement the record is found not well taken and will be denied.

The following categories of documents are at issue in the first motion to compel.

### 1. Insured Files

■ Numbers 25, 26, 29, and 30 of plaintiffs' first request for production of documents seek documents related to Nationwide homeowner's policies issued, cancelled, or nonrenewed: number 25 seeks documents relating to each homeowner's insurance policy issued or sold by Nationwide in the city of Toledo [10] since January 1, 1983; number 26 seeks the same information for policies renewed in the city of Toledo since January 1, 1983; number 29 seeks the same information for policies cancelled in Toledo since January 1, 1983; and number 30 seeks the same information for policies nonrenewed in Toledo since January 1, 1983.[11] Nationwide objects to this request on the basis of overbreadth, relevance, and burdensomeness. It also argues that the privacy rights of its insureds would be violated. Finally, Nationwide argues, not only with regard to this set of requests but with all requests dating back to 1983, that going back ten (and now

---

**10.** The plaintiffs' original request sought this information for the "Toledo Metropolitan Area." Later, for clarity, they agreed to seek these documents for the city of Toledo only.

**11.** The plaintiffs also seek this same information for applications submitted to and rejected by Nationwide. See Plaintiffs' Post–Hearing Memorandum Regarding Burdensomeness, pages 9–10. However, this request is not properly before the court because it was not made a part of either motion to compel. Such a request will be considered upon a proper motion.

thirteen) years in its files is unnecessarily burdensome. Nationwide argues that three years is a more reasonable timeframe.

It is clear from the record that the database yielding most of the information sought by the plaintiffs is the Field Underwriting System ("FUS"). Nationwide put the FUS electronic or computerized database into use in the fall of 1986. Earlier data is stored on microfiche. Nationwide uses three other electronic databases in conjunction with FUS: the Fire Processing System ("FPS"), the Fire Historical Database, and the Fire Historical Tape.

With regard to burdensomeness, Nationwide argues that to retrieve the information requested by the plaintiffs in request numbers 25, 26, 29, and 30 would cost some $112,500. This figure includes the cost to plan, devise, and execute the computer programs that would make the information on the four databases readable by a layperson. According to Nationwide, it would need to expend several thousand additional dollars to conduct a manual search of microfiche for data predating the 1986 introduction of the FUS.

While it is true that historical data is important in discrimination cases, see, e.g., Arlington Hts. v. Metro. Hous. Dev. Corp. (1977), 429 U.S. 252, 267, 97 S.Ct. 555, 564–565, 50 L.Ed.2d 450, 465–466, (historical background can be important in proving discrimination), it seems unnecessary to go back thirteen years. Since Nationwide introduced the FUS in 1986, it is logical to use that as a starting point for discovery. If, after reviewing the information produced by the computer search, the plaintiffs believe that information vital to their case is stored on microfiche, another motion to compel such information will be considered.

 With regard to the discoverability of the computerized data, I find that the information sought in request numbers 25, 26, 29, and 30 is highly relevant to the plaintiffs' case and is, therefore, discoverable. Nationwide shall bear the cost of retrieving this information and making it available to the plaintiffs in a format readable by a layperson. Nationwide strenuously argues that the cost of producing the requested discovery is overly burdensome, and the record confirms that the cost is potentially great. However, inconvenience and expense, by themselves, do not justify denying discovery. See Isaac v. Shell Oil Co. (E.D.Mich.1979), 83 F.R.D. 428, 431 (discovery denied). Furthermore, a party cannot avoid discovery when its own recordkeeping system makes discovery burdensome. If a party chooses to store information in a manner that tends to conceal rather than reveal, that party bears the burden of putting the information in a format useable by others. See id.; Kozlowski v. Sears, Roebuck & Co. (D.Mass.1976), 73 F.R.D. 73, 76. See, also, Dunn v. Midwestern Indemn. (S.D.Ohio 1980), 88 F.R.D. 191, 198 (applying Kozlowski to computer-generated discovery in an insurance redlining case).

▆ This case must be distinguished from the *Isaac* sort of situation in which the party seeking expensive and burdensome discovery has not demonstrated a reasonable basis for the allegations in the complaint and is fishing for evidence. See *Isaac*, 83 F.R.D. at 431–432. In this case, the record contains some evidence to support the allegations in the plaintiffs' first amended complaint. Thus, the motion to compel responses to numbers 25, 26, 29, and 30 of plaintiffs' first request for production of documents will be granted, but only from fall 1986 (when the FUS was introduced) to the present. With regard to Nationwide's privacy concerns, the information responsive to these requests shall be under seal, and the parties are under a continuing obligation to abide by the prior confidentiality order of record.

## 2. Property Inspections

▆ Number 26 of plaintiffs' second request for production of documents seeks information on all inspections performed of Toledo area properties since January 1, 1983. The plaintiffs claim that inspection reports often form the basis for the cancellation or nonrenewal of homeowner's policies and thus are relevant to their claims. Nationwide objects on the basis of burdensomeness and over-breadth. According to Nationwide, it has conducted thousands of inspections since 1983, and no central repository exists for storing these reports. Further, they are not retrievable by computer. Nationwide also raises the same privacy and temporal scope concerns discussed earlier.

The request for the property inspection reports is calculated to lead to the discovery of admissible evidence and it is therefore discoverable. An examination of these reports may show, for example, that comparable homes in different neighborhoods are not treated comparably when it comes to home inspections. However, the plaintiffs will not be permitted to discover documents going back to 1983; instead, discovery will be ordered only from September 1, 1986 to the present. With regard to Nationwide's argument that it will be required to conduct a manual search for these documents, Nationwide will not be permitted to frustrate discovery of relevant material because the method it has chosen to store documents makes it burdensome to retrieve them. See *Kozlowski*, 73 F.R.D. at 76. Finally, Nationwide's privacy concerns can be handled by keeping these documents under seal and by the parties adhering to the confidentiality order already on file.

## 3. Documents Showing Locations of Policies, Including those Cancelled or Nonrenewed

▆ Numbers 36, 39, and 40 of plaintiffs' first request for production of documents seek documents showing the location (in the city of Toledo) where policies are issued (number 36), where they have been cancelled (number 39), and

where they have been non-renewed (number 40). In other words, the plaintiffs want to know where in the city Nationwide chooses to do business and where it chooses not to do business. Nationwide objects on the basis of relevance, overbreadth, and burdensomeness. According to Nationwide, the evidence of "burdensomeness" it put on at the January 5, 1995 hearing applies equally to request numbers 25, 26, 29, and 30 as well as 36, 39, and 40. Nationwide also argues that data predating the FUS would require a costly and burdensome manual search.

Again, the information sought in numbers 36, 39, and 40 is clearly relevant to the plaintiffs' claims. Examination of this material may show, for example, that Nationwide does business predominantly in white neighborhoods and that it cancels or refuses to renew policies in neighborhoods with increasing African–American populations. Because of its relevance, the information sought in numbers 36, 39, and 40 of plaintiffs' first request for production of documents is discoverable, but only since fall 1986, when Nationwide introduced the FUS.

4. Documents Relating to Corporate Sales Meetings and Department Meetings

Number 52 of plaintiffs' second request for production of documents seeks documents relating to district sales meeting since January 1, 1983. Similarly, number 53 of plaintiffs' second request seeks documents related to meetings of Nationwide's Property/Casualty sales department or meetings of its Marketing Administration department since January 1, 1983. The plaintiffs contend that these documents might give them some information about Nationwide's marketing strategy. Nationwide objects on the basis of relevance and overbreadth.

The plaintiffs justify the request for district sales meetings by stating, "Nationwide periodically conducts meetings with its agents in the Toledo area to discuss various topics, including sales and marketing of homeowner's products." This statement, alone, is not enough to warrant a finding that request number 52 is reasonably calculated to lead to the discovery of admissible evidence. In this particular request, the plaintiffs appear merely to be speculating about the kind of information they might find if they had access to these documents. Unlike the other requests, where the plaintiffs know the type of information that will be retrieved but are speculating about what the information will show, in request numbers 52 and 53 they are speculating both about the information that will be retrieved and what the information will show. Therefore, the plaintiffs' motion will be denied as to numbers 52 and 53 of plaintiffs' second request for production of documents.

5. General Financial Information

In numbers 41 and 42 of their first request for production of documents, plaintiffs seek documents showing Nationwide's financial status. They seek this information because they have asserted a claim for punitive damages. Number 41 seeks income tax returns (federal and state) for the years 1990, 1991, and 1992, and number 42 seeks other financial data including financial statements, balance sheets, etc. for the years 1990, 1991, and 1992. Nationwide objects on the basis of overbreadth and argues that much of what the plaintiffs seek can be obtained from the Ohio Department of Insurance. In the alternative, Nationwide argues that discovery of this financial data should be stayed until its liability is established. I find that this information is relevant and the request is reasonably calculated to lead to the discovery of admissible evidence. See *Wagner v. McDaniels* (1984), 9 Ohio St.3d 184, 187, 9 OBR 469, 471–472, 459 N.E.2d 561, 564. Therefore, plaintiffs' motion to compel will be granted as to numbers 41 and 42 of their first request for production of documents.

6. Documents Showing Corporate Structure

In number 46 of plaintiffs' first request for production of documents, plaintiffs seek documents describing or depicting Nationwide's corporate structure. In numbers 61 and 62 of plaintiffs' second request, the plaintiffs seek documents depicting the internal corporate structure, lines of supervision, or departments or areas of responsibility of both Nationwide Mutual Insurance Company (number 61) and Nationwide Mutual Fire Insurance Company (number 62). The plaintiffs contend that they know very little about Nationwide's corporate structure, and since they challenge various practices, perhaps done by various departments, they need more information about how Nationwide is organized. Nationwide objects on the basis of overbreadth, relevance, and burdensomeness. Nationwide also states that it already provided the plaintiffs with a chart but that the plaintiffs were not satisfied. The plaintiffs agree that they received a chart but argue that it was not at all responsive to their requests. Nationwide contends that a chart responsive to the plaintiffs' requests does not exist, a fact sworn to by David White, a Nationwide employee. If such a chart does not exist, it cannot be produced. This information, however, may be learned through deposition testimony. The motion to compel is denied with respect to number 46 of plaintiffs' first request for production of documents and numbers 61 and 62 of the plaintiffs' second request for production of documents.

7. Identification of Potential Witnesses

In interrogatory number 14, plaintiffs ask Nationwide to identify each Nationwide employee or officer, particularly those in the underwriting, sales, marketing, or ratings departments, who has ever collected articles or other documents relating to redlining, race discrimination, or geographic discrimination. According to the plaintiffs, this information may bear on issues of knowledge and intent.

Nationwide objects because the interrogatory makes no distinction between personal files and those kept in the ordinary course of business. Nationwide also objects on the grounds of overbreadth and burdensomeness, but it offers to seek this information from its underwriting, sales, marketing, and pricing department employees. Since these are the departments the plaintiffs are most interested in, Nationwide's offer is reasonable. Therefore, the plaintiffs' motion to compel as to interrogatory number 14 will be granted to the extent that Nationwide will be ordered to produce the information for its employees in its underwriting, sales, marketing, and pricing departments.

### 8. Overdue Production

According to the plaintiffs, they served their second request for production of documents on June 2, 1994. When Nationwide responded, it promised to make their responses to the unopposed requests available at the mutual convenience of the parties. The plaintiffs state that Nationwide has not done so. Nationwide will be ordered to produce these documents within thirty days of the date of this opinion and judgment entry.

### B. The Plaintiffs' Second Motion to Compel

The plaintiffs' second motion to compel filed on July 20, 1995, deals mainly, though not exclusively, with their third request for production of documents. In opposing this second motion to compel, Nationwide asserts generally that any discovery going to the merits of the case should be stayed pending the outcome of the class certification motion. Since the class certification motion is now resolved, determination of the disputes relating to the "merits" discovery will not be stayed. The following categories of documents are at issue in the second motion to compel.

### 1. LAMP Maps

In number 45 of plaintiffs' first request for production of documents, plaintiffs seek original, color-coded Local Area Marketing Plan ("LAMP") maps. Though this request was once in dispute, the plaintiffs now agree that Nationwide has produced these documents.[12] Therefore, the plaintiffs' second motion to compel is moot as to number 45 of plaintiffs' first request for production of documents.

### 2. Documents Promised in Response to Plaintiffs' Third Request for Production of Documents

Though these documents were initially in dispute, the plaintiffs "conditionally" agree that Nationwide has produced them. Therefore, plaintiffs' second motion

---

12. The plaintiffs "conditionally" agree that they received these documents because they have not yet had a chance to review them.

to compel is moot as to the documents promised by Nationwide in response to plaintiffs' third request for production of documents.

### 3. Documents from Nationwide's Office of Strategic Marketing Services

 Numbers 4, 5, 6, and 7 of plaintiffs' third request for production of documents are in dispute. Number 4 seeks documents relating to the use of household growth or household income as factors relevant to the marketing or sale of homeowner's insurance; number 5 seeks documents relating to customer preferences regarding the location of agents; number 6 seeks documents relating to the influence of multi-lining or multi-product selling on customer retention; and number 7 seeks documents relating to urban markets or low growth/low income areas. The plaintiffs argue that these documents are relevant because they have alleged that strategic marketing considerations are used to discriminate in African–American neighborhoods. Nationwide, on the other hand, contends that the plaintiffs have no right to this discovery because it has no bearing on the plaintiffs' individual claims. Also, Nationwide argues that the requests are overbroad because they are unlimited in temporal scope and unlimited geographically. In reply, the plaintiffs state that, inasmuch as the named plaintiffs are all homeowners in "redlined" neighborhoods, Nationwide's marketing strategies are relevant to their claims. As to the overbreadth argument, the plaintiffs reply that historical practices are relevant in discrimination cases.

While the information sought by these requests is relevant to the plaintiffs' claims as homeowners in African–American neighborhoods, Nationwide's overbreadth arguments have some merit. Therefore, this discovery will be ordered, but only for the city of Toledo and only since September 1, 1986.

### 4. Statements Made by Nationwide Employees Regarding Redlining

 Number 8 of plaintiffs' third request for production of documents seeks an article by a Nationwide employee on the subject of redlining, and number 9 seeks the text of a speech given by a Nationwide employee on the subject of redlining. The plaintiffs contend that these documents are relevant to issues of knowledge and intent. Nationwide does not present an argument as to why these documents are not discoverable, but it originally objected on the basis of relevance. Even though the speech was given as long ago as 1981, I find that these documents are relevant and, provided that they can be found, not at all burdensome to produce. Therefore, plaintiffs' motion to compel will be granted as to numbers 8 and 9 of plaintiffs' third request for production of documents.

### 5. Documents Revealed at Witness Depositions

Plaintiffs contend that several documents responsive to requests in their first and second requests for production of documents were not produced but were

later identified in the depositions of Nationwide witnesses. The plaintiffs list these documents on page 9 of their memorandum in support of their second motion to compel. Nationwide does not provide an argument why these items are not discoverable, though in an April 6, 1995 letter from Nationwide attorney Joel Rice to plaintiffs' attorney Stephen Dane, Rice wrote, "The documents you have listed are neither relevant to the individual claims nor pertinent to the issue of class certification. Such discovery should, therefore, at least be held in abeyance pending resolution of your class motion." Since the class certification motion has now been resolved in favor of certification, and since the request is reasonably calculated to lead to the discovery of admissible evidence, this discovery will be ordered, but only since September 1, 1986 and, where county-wide information is involved, only for Lucas County.

### 6. Agent Portfolio Analyses

Number 12 of the plaintiffs' second request for production of documents seeks all agent portfolio analyses generated since January 1, 1983, for each agent doing business in the Toledo metropolitan area. The plaintiffs describe these documents as computer-generated reports detailing each agent's "portfolio" of business, including data summaries. According to the plaintiffs, this information, which is sorted geographically by ZIP code, is relevant to their redlining claim. Nationwide objects to this request on the basis of relevance. According to Nationwide, some of these reports are irrelevant because they contain information about life, auto, and other types of policies not at issue in this case. Nationwide also contends that the time frame is excessive. Finally, Nationwide argues that information on agents not involved in this case is irrelevant.

Information detailing Nationwide agents' business in the city of Toledo is clearly relevant to the plaintiffs' claims. However, the request must be pared down so that it retrieves only the relevant data. Therefore, the plaintiffs' motion to compel will be granted as to number 12 of their second request for production of documents but only for homeowner's policies, only since September 1, 1986, and only for the city of Toledo. The request will not be limited only to agents involved in this case, however, as information on all Toledo Nationwide agents may be relevant to the disparate impact elements of the plaintiffs' claims.

### 7. PLUS Agent Program

Number 38 of plaintiffs' second request for production of documents seeks documents relating to Nationwide's PLUS Agent Program. Plaintiffs contend that this set of documents relates to the Nationwide/corporate agent relationship, and these documents may be relevant if Nationwide directs its agents to conduct business in certain ways or gives incentives for certain practices. Nationwide argues that these documents are irrelevant because the

PLUS Agent Program deals only with fire and auto policies. I find that these documents are not discoverable because they are not reasonably calculated to lead to the discovery of admissible evidence. Like the requests for district sales meetings and corporate department meetings (numbers 52 and 53 of plaintiff's second request for production of documents), here plaintiffs are merely speculating about the kind of information they will receive. Until the plaintiffs have some basis for believing that relevant evidence exists in these files, their motion to compel is denied with regard to number 38 of their second request for production of documents.

8. Missing Pages in Discovery Already Produced

The plaintiffs contend that several pages are missing from the discovery responses sent by Nationwide. (See list on page 11 of Plaintiffs' Second Motion to Compel with Memorandum in Support.) Nationwide responds that these pages are not missing; they have either been purposely omitted or portions have been redacted because of irrelevance (mainly due to temporal and geographic concerns). Plaintiffs' motion to compel will be granted as to these "missing" documents, but only since September 1, 1986, only for the city of Toledo, and only for homeowner's insurance.

9. Missing Documents from Previous Requests

On pages 12–14 of Plaintiffs' Second Motion to Compel with Memorandum in Support, the plaintiffs list documents that they say Nationwide promised to search for but then failed to produce. Again, Nationwide argues that the documents not produced are either privileged or are irrelevant (based on temporal scope or geographic scope). Nationwide also contends that it has produced some of these "missing" documents. With regard to the documents already produced, the plaintiffs (conditionally) agree that they have received them. (See number 3, pages 9–10 of Defendant's Memorandum in Opposition to Plaintiffs' Second Motion to Compel.) With regard to the relevance objections, Nationwide shall produce all of the "missing" documents dated September 1, 1986 or later, pertaining to the city of Toledo, and dealing with homeowner's policies. All documents in this category that are claimed to be privileged will be ordered produced for *in camera* inspection.

## JUDGMENT ENTRY

It is ordered that the plaintiffs' motion for class certification is granted, and the following class is conditionally certified in accordance with Civ.R. 23(C)(1):

All persons who, at any time between July 1, 1979 and the date of trial, have owned a home located in an African–American neighborhood in the City of Toledo. An "African–American neighborhood" is defined for purposes of this

case as any census tract with an African–American population greater than fifty percent (50%), according to 1990 U.S. Census Data.

It is further ordered that the following persons are representatives of the class: Helen Phillips, Marian Pearce, Charles Taylor, Rose Newton, Nellie Edwards, Sandra Sutton, James Sutton, Wilma Harris, Robert Rivers, and Janice Rivers.

It is further ordered that on or before the 20th day of February, 1996, the plaintiffs shall submit for court approval a workable plan for identifying the individual names and addresses of all class members as well as workable plan for publication of said notice.

It is further ordered that on or before the 20th day of February, 1996, the plaintiffs shall submit for court approval a notice to class members of this determination containing the information required by Civ.R. 23(C)(2).

It is further ordered that said notice be sent by ordinary mail to all class members who can be identified through reasonable effort.

It is further ordered that notice by publication shall be employed for those class members who cannot be identified through reasonable effort.

It is further ordered that upon completion of service of notice, plaintiffs shall file affidavits attesting to compliance with the terms of this order.

It is further ordered that the plaintiffs' first motion to compel filed September 19, 1994 is granted in part and denied in part as follows:

1. The motion to compel is granted as to numbers 25, 26, 29, and 30 of plaintiffs' first request for production of documents, but only from fall 1986 (when the Field Underwriting System database was introduced) to the present. These documents shall be marked "confidential" and kept under seal, and the parties are under a continuing obligation to abide by the confidentiality order filed on October 26, 1993;

2. The motion to compel is granted as to number 26 of plaintiffs' second request for production of documents, but only from September 1, 1986 to the present. These documents shall be marked "confidential" and kept under seal, and the parties are under a continuing obligation to abide by the confidentiality order filed on October 26, 1993;

3. The motion to compel is granted as to numbers 36, 39, and 40 of plaintiffs' first request for production of documents, but only since fall 1986 (when the Field Underwriting System was introduced);

4. The motion to compel is denied as to numbers 52 and 53 of plaintiffs' second request for production of documents;

5. The motion to compel is granted as to numbers 41 and 42 of plaintiffs' first request for production of documents;

6. The motion to compel is denied as to number 46 of plaintiffs' first request for production of documents and numbers 61 and 62 of plaintiffs' second request for production of documents;

7. The motion to compel is granted as to plaintiffs' interrogatory number 14, but only for employees from the underwriting, sales, marketing, and pricing departments;

8. The motion to compel is granted as to the unopposed requests of plaintiffs' second request for production of documents.

It is further ordered that plaintiffs' second motion to compel filed on July 20, 1995 is granted in part and denied in part as follows:

1. The motion to compel is moot as to number 45 of plaintiffs' first request for production of documents;

2. The motion to compel is moot as to the documents promised in response to plaintiffs' third request for production of documents;

3. The motion to compel is granted as to numbers 4, 5, 6, and 7 of plaintiffs' third request for production of documents, but only for the city of Toledo and only since September 1, 1986;

4. The motion to compel is granted as to numbers 8 and 9 of plaintiffs' third request for production of documents;

5. The motion to compel is granted as to the documents listed on page 9 of plaintiffs' memorandum in support of their second motion to compel, but only since September 1, 1986 and, where countywide information is involved, only for Lucas County;

6. The motion to compel is granted as to number 12 of plaintiffs' second request for production of documents, but only for homeowner's policies, only since September 1, 1986, and only for the city of Toledo;

7. The motion to compel is denied as to number 38 of plaintiffs' second request for production of documents;

8. The motion to compel is granted as to the "missing" pages of discovery listed on page 11 of plaintiffs' memorandum in support of its second motion to compel, but only for homeowner's insurance, only since September 1, 1986 (or the installation of the Field Underwriting System database, where applicable), and only for the city of Toledo;

9. The motion to compel is granted as to the unprivileged "missing" documents listed on pages 12–14 of plaintiffs' memorandum in support of their second

motion to compel, but only for homeowner's policies, only since September 1, 1986, and only for the city of Toledo. Defendants Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company are ordered to submit to the court for *in camera* inspection all documents in this category that are claimed to be privileged.

It is further ordered that the documents compelled by this judgment entry shall be produced by April 17, 1996.

It is further ordered that the plaintiffs' motion to supplement the record filed on November 9, 1994, is DENIED.

*Judgment accordingly.*